# United States Court of Appeals for the Federal Circuit

05-1570, -1598

MONSANTO COMPANY,

Plaintiff-Cross Appellant,

v.

HOMAN McFARLING,

Defendant-Appellant.

Paul R.Q. Wolfson, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, argued for plaintiff-cross appellant. With him on the brief were Seth P. Waxman, Shirley Cassin Woodward, and Gregory H. Lantier. Of counsel on the brief was Joseph C. Orlet, Husch & Eppenberger, LLC, of St. Louis, Missouri.

Mark A. Lemley, Keker & Van Nest, L.L.P., of San Francisco, California, argued for defendant-appellant. Jim D Waide, III, Waide & Associates, P.A., of Tupelo, Mississippi, for defendant-appellant. Of counsel was Alan B. Morrison, Stanford Law School, of Stanford, California.

Appealed from: United States District Court for the Eastern District of Missouri

Judge Catherine D. Perry

# United States Court of Appeals for the Federal Circuit

05-1570,-1598

MONSANTO COMPANY,

Plaintiff-Cross Appellant,

v.

HOMAN McFARLING,

Defendant-Appellant.

_____

DECIDED: May 24, 2007

_____

Before LOURIE, RADER, and BRYSON, Circuit Judges.

BRYSON, Circuit Judge.

This is the third time this case has been before us. In the first appeal, we affirmed the district court's entry of a preliminary injunction in favor of the plaintiff, Monsanto Company, and against the defendant, Homan McFarling. Monsanto Co. v. McFarling, 302 F.3d 1291 (Fed. Cir. 2002) (McFarling I). In the second appeal, we upheld the district court's rulings holding Mr. McFarling liable for breach of contract and rejecting Mr. McFarling's counterclaims and affirmative defenses. We reversed the judgment in that case, however, holding that the liquidated damages provision in the parties' contract was an unenforceable penalty, and we remanded for a determination of Monsanto's actual damages. Monsanto Co. v. McFarling, 363 F.3d 1336 (Fed. Cir. 2004) (McFarling II). After a damages trial, the district court entered an award of

damages for patent infringement, rejected Mr. McFarling's arguments for vacating the judgment of liability, and refused Monsanto's request to modify the permanent injunction. We affirm on both Mr. McFarling's appeal and Monsanto's cross-appeal.

I

Monsanto developed a system for weed control that employs genetically modified crops that resist glyphosate herbicide. Upon planting such crops, farmers can spray glyphosate herbicide over their fields to kill weeds while sparing the resistant crops, a technique that allows for much more efficient weed control than is possible with unmodified plants. Monsanto sells the glyphosate herbicide under the trade name Roundup and sells seeds of the genetically modified crops, in this case soybeans, under the trade name Roundup Ready.

Two patents of importance here protect aspects of Monsanto's Roundup Ready technology. First, Monsanto's U.S. Patent No. 5,633,435 ("the '435 patent") claims a plant cell containing a DNA molecule that encodes a genetically modified enzyme. That enzyme allows plants to survive exposure to glyphosate herbicide. Second, Monsanto's U.S. Patent No. 5,352,605 ("the '605 patent") claims a plant cell containing a genetic promoter sequence that facilitates a plant's production of the modified enzyme. Although the '605 patent does not explicitly claim a seed containing a specific genetic sequence, as does the '435 patent, the parties do not dispute that Roundup Ready soybeans contain the plant cells and the promoter sequences claimed in the '605 patent.

Monsanto distributed the patented seeds by authorizing various companies to produce the seeds and sell them to farmers. Monsanto required those seed companies to

obtain a signed "Technology Agreement" from purchasers. The Technology Agreement licensed the '435 and '605 patents to farmers on several conditions and required that farmers promise not to violate those conditions. Of relevance here, farmers promised not to replant seeds that were produced from the purchased seeds or to supply those seeds to others for replanting. Those promises ensure that a farmer who uses Roundup Ready seeds buys the seeds that he plants each year.

The purchasers also paid a fee to Monsanto for the license. For the time periods relevant here, Monsanto charged a license fee of $6.50 per 50-pound bag of Roundup Ready soybean seed. Mr. McFarling also would have had to pay a seed company between $19 and $22 for each bag of the seed that he purchased.

In 1998, Mr. McFarling purchased Roundup Ready soybean seeds from a seed company. He signed the Technology Agreement for that year and paid the required fees. In violation of the license agreement, however, he saved seeds from his 1998 soybean crop and planted those seeds in 1999. He did the same thing the next year, saving soybeans from his 1999 crop and planting them in 2000. The saved seeds contained the patented genetic traits, but Mr. McFarling did not pay the license fee for the 1999 or 2000 growing seasons.

Upon learning of Mr. McFarling's conduct, Monsanto sued him in the United States District Court for the Eastern District of Missouri, asserting that he had breached the Technology Agreement and infringed the '435 and '605 patents. The district court granted Monsanto's motion for a preliminary injunction prohibiting Mr. McFarling from continuing to plant saved Roundup Ready soybeans, and we affirmed that decision on appeal. McFarling I, 302 F.3d at 1300.

Monsanto then moved in the district court for summary judgment on some but not all of the pending claims—namely, the breach of contract claim, the claim of infringement of the '605 patent, and all of Mr. McFarling's counterclaims. Monsanto did not move for summary judgment on its '435 patent claim. In response, Mr. McFarling raised various defenses, including patent misuse and preemption by the Plant Variety Protection Act. The district court rejected those defenses and granted Monsanto's motion in full except as it concerned damages for breach of contract and infringement of the '605 patent. With liability resolved, the parties stipulated to the amount of liquidated damages under the license agreement, and the district court entered judgment on Monsanto's breach of contract claim and on Mr. McFarling's counterclaims. The court then entered an order under Federal Rule of Civil Procedure 54(b) allowing an immediate appeal on the decided claims.

On appeal, we affirmed the dismissal of Mr. McFarling's antitrust counterclaim and the rejection of his defenses of patent misuse and preemption by the Plant Variety Protection Act. However, we vacated the liquidated damages award as an unenforceable penalty and remanded for further proceedings. McFarling II, 363 F.3d at 1341–44, 1352.

After our decision in the second appeal, Monsanto withdrew all of its claims other than the '605 patent claim, on which it had already secured a liability ruling; it then proceeded to try the issue of damages to a jury on that claim alone. During the trial on damages, Mr. McFarling moved for judgment as a matter of law based on his patent misuse defense, contending that the patent misuse defense was given new life by

Monsanto's withdrawal of one of its two claims for patent infringement. The district court denied that motion.

During the damages trial, Mr. McFarling also moved for a directed verdict that an established royalty for his infringing conduct limited the size of a damages award. The district court denied the motion and submitted the issue of damages to the jury.

The jury returned a damages verdict of $40 per bag of saved seed, well in excess of the $6.50 per bag for which Mr. McFarling had argued, but substantially less than the $80.65 per bag (for 1999) and $73.20 per bag (for 2000) urged by Monsanto based on the analysis of its expert. Mr. McFarling again moved to limit the damages award to what he contended was Monsanto's $6.50 per bag established royalty for use of its patented technology. The district court denied the motion, adopted the jury's verdict, and awarded Monsanto approximately $375,000 in damages. The district court also permanently enjoined Mr. McFarling from future unauthorized use of the patented technology.

II

On appeal, Mr. McFarling first argues that Monsanto's withdrawal of its claim for infringement of the '435 patent undermines the rationale of our decision in McFarling II and requires that we revisit our rejection of his defenses and counterclaims. We disagree.

In McFarling II, we addressed Mr. McFarling's argument that Monsanto's license terms impermissibly restricted the use of farmer-grown Roundup Ready soybean seeds. We rejected that defense because "the licensed and patented product (the first generation seeds) and the good made by the licensed product (the second-generation

seeds) are nearly identical copies." Thus, "given that the '435 patent reads on the first-generation seeds, it also reads on the second-generation seeds." 363 F.3d at 1343. Accordingly, we held that there was no patent misuse, because the prohibition against use of second-generation seeds was simply a prohibition against unlicensed use of the patented invention.

Mr. McFarling now seizes upon our reference to the '435 patent to argue that our rejection of his patent misuse defense was undermined by Monsanto's withdrawal of its claim for infringement of the '435 patent. Our reasoning in McFarling II, however, is equally applicable to the '605 patent. Although that patent does not explicitly claim seed containing a Roundup Ready genetic trait, it claims plant cells having that genetic trait, and farmer-grown Roundup Ready soybeans undisputedly contain such cells. Thus, as in the case of the '435 patent, Monsanto's '605 patent reads on both purchased and farmer-grown Roundup Ready soybeans. There is no patent misuse in the license terms for either patent.

Mr. McFarling asserts that the "unpatented germ plasm and second generation of genetically-altered soybeans is not a 'human-made' invention." But the fact that the germ plasm and the soybeans are not "human-made" is irrelevant to infringement. What is human-made are the chimeric genes claimed in the '605 patent, which are found in all of the infringing seeds at issue in this case. The principles of patent law do not cease to apply when patentable inventions are incorporated within living things, either genetically or mechanically.

Mr. McFarling next argues that his rejected antitrust counterclaim has new vitality in light of Monsanto's dismissal of its '435 patent claim. Again, we disagree. In

<u>McFarling II</u>, we noted that Mr. McFarling's antitrust counterclaim was simply a repackaged version of his patent misuse defense, and we affirmed the dismissal of the antitrust counterclaim on the same grounds. 363 F.3d at 1343–44. Because nothing about the withdrawal of Monsanto's claim on its '435 patent undermines the rationale for our rejection of Mr. McFarling's patent misuse defense, we adhere to our previous rejection of his antitrust counterclaim.

Finally, Mr. McFarling asks in a footnote that we reconsider our decision in <u>McFarling II</u> that the Plant Variety Protection Act does not entitle farmers to infringe patents by planting farmer-grown saved seed that is not licensed for planting. 363 F.3d at 1344. Nothing about the posture of this appeal warrants reconsideration of that aspect of our prior decision.

III

Mr. McFarling next challenges the amount of the damages award. He contends that it grossly exceeds the amount that is justified, which should be limited to the "established royalty" for Roundup Ready seeds, i.e., the "Technology Fee" of $6.50 per bag that Monsanto charged licensees who purchased Roundup Ready seeds under its Technology Agreement.

A

By statute, damages for patent infringement are to be "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. After our remand in <u>McFarling II</u>, Monsanto elected to pursue the reasonable royalty measure of its damages. In response, Mr. McFarling argued that

there is an established royalty of $6.50 per bag that should apply to his infringing conduct, and he asked the court to limit the amount of the reasonable royalty to that amount. The district court found "some legitimacy" in that argument but ultimately denied the motion and submitted the damages issue to the jury.

An established royalty is usually the best measure of a "reasonable" royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree. When the patentee has consistently licensed others to engage in conduct comparable to the defendant's at a uniform royalty, that royalty is taken as established and indicates the terms upon which the patentee would have licensed the defendant's use of the invention. Birdsall v. Coolidge, 93 U.S. 64, 70 (1876) (an established royalty furnishes the best measure of damages); Nickson Indus., Inc. v. Rol Mfg. Co., 847 F.2d 795, 798 (Fed. Cir. 1988) (absent proof of unusual circumstances, such as widespread infringement that artificially depressed the established royalty, an established royalty is the best measure of a reasonable royalty); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078 (Fed. Cir. 1983) (same); see also Rude v. Wescott, 130 U.S. 152, 165 (1889) (listing criteria defining an established royalty).

Monsanto has consistently licensed farmers to use its Roundup Ready technology pursuant to the terms of a standard license agreement. For the relevant years, Monsanto agreed to let soybean farmers use the patented traits in planting and growing soybean crops and to let them sell the harvested seeds as a commodity. In exchange, farmers agreed to pay Monsanto a Technology Fee and to refrain from planting Roundup Ready seed saved from a previous season's crop and from selling

Roundup Ready seed from their crop to others for planting. Those promises ensured that the farmers had to purchase the Roundup Ready seed they planted in a given year from an authorized distributor. The distributor seed companies, some of which were owned by Monsanto and some of which were independent, also charged a fee for each bag of Roundup Ready soybeans they sold.

Mr. McFarling's infringing conduct consisted of planting patent-protected seeds in 1999 and 2000 without purchasing them from a seed company licensed or owned by Monsanto. Because Mr. McFarling neither paid Monsanto the Technology Fee nor purchased the Roundup Ready seed from an authorized distributor, the value to Monsanto of both performances provides one measure of the "reasonable royalty for the use made of the invention by the infringer." 35 U.S.C. § 284. The parties agree that the amount of the Technology Fee was $6.50 per 50-pound bag of Roundup Ready soybean seed for the pertinent years, 1999 and 2000. Because that fee does not take into account the added obligation imposed on all authorized licensees under the Technology Agreement—to purchase seed from an authorized seed store—the trial court was correct to refuse to treat the $6.50 Technology Fee as the established royalty for a license comparable to the infringing conduct. See Monsanto Co. v. Ralph, 382 F.3d 1374, 1383–84 (Fed. Cir. 2004).

Monsanto in effect decided that under its standard licensing program it would extract $6.50 in direct payment and would also extract an undertaking to buy seed from a seed company, which imposed an additional cost of $19 to $22 per bag on the farmers. The fact that Monsanto elected to allocate its licensing fees by obtaining a direct payment of $6.50 and ensuring a payment to the seed companies of another $19

to $22 does not mean that the royalty for its standard license was only $6.50. It means that, for a variety of economic reasons, Monsanto decided to split the royalty up into two parts and to direct part of the royalty to the third-party seed companies, which promoted and distributed Monsanto's products. The out-of-pocket cost that the farmers paid for the right to use Monsanto's technology was thus $25.50 to $28.50. In effect, the amount of that cost that can be characterized as a pure royalty payment was $25.50 to $28.50 minus the modest cost of cleaning and bagging the seeds and other transaction costs.

Picking $6.50 as the upper limit for the reasonable royalty would create a windfall for infringers like McFarling. Such infringers would have a huge advantage over other farmers who took the standard Monsanto license and were required to comply with the provisions of the license, including the purchase-of-seed and non-replanting provisions. The evidence at trial showed that Monsanto would not agree to an unconditional license in exchange for a payment of $6.50, and the explanation—that Monsanto would lose all the benefits it gets from having the cooperation of seed companies in promoting Monsanto's product and controlling its distribution—is a reasonable commercial strategy.

By insisting that the established royalty is $6.50 per bag, Mr. McFarling does not acknowledge the significance of the requirement that licensees not only pay the $6.50, but also purchase the genetically modified seeds from a seed company rather than replanting saved seed. He does not argue, even in the alternative, that the court should have limited the reasonable royalty to the total amount paid by licensed farmers for patent-protected seeds. In any event, for the reasons given below it would be improper

to hold that Monsanto's reasonable royalty damages are limited to $25.50 to $28.50 per bag, the total amount charged for the seeds and the Technology Fee.

Monsanto's evidence at trial showed that the requirement that farmers purchase their seed each year instead of saving seed from the previous year had particular benefits to Monsanto above and beyond the monetary payments represented by the Technology Fee and the seed prices charged by the seed companies. Monsanto's experts testified that the no-saving-seed requirement (1) decreased the risk of under-reporting and the consequent reputation harm to Monsanto with farmers, (2) ensured Monsanto's knowledge of the quality of seed planted each year, and (3) provided a bargaining chip for signing up new seed companies. It is difficult to assign a dollar value to those benefits, but the benefits nonetheless justify the jury's finding that a reasonable royalty for a license to engage in conduct like Mr. McFarling's would exceed the amount of the payments made by farmers who participated in the licensing program.

In determining the amount of a reasonable royalty, it was proper for the jury to consider not only the benefits of the licensing program to Monsanto, but also the benefits that Monsanto's technology conferred on farmers such as Mr. McFarling. Monsanto's expert testified at length regarding the valuation of Monsanto's damages. He began by estimating the value conferred on a farmer such as Mr. McFarling by the use of the Roundup Ready product. Because using conventional soybeans was the most logical alternative to either licensing or infringing, that value provided a reasonable basis for estimating the advantages conferred by the use of the patented technology.

The expert testified that the use of Roundup Ready seeds increased the yield of soybeans in an amount valued at $14 to $25 per acre as compared to conventional

seeds. In addition, the expert testified that the use of Roundup Ready seeds reduced the costs of weed control in an amount valued at $26 to $36 per acre as compared to conventional seeds; he based that estimate on three studies that showed cost savings for the Roundup Ready system ranging from a low of $17 to a high of $36. Even using the lowest dollar amount disclosed in any of the studies as the minimum amount for savings on weed control ($17), and even disregarding the expert's testimony about other possible savings associated with the use of the Roundup Ready system, those two items alone result in an estimated savings of $31 to $61 per acre as compared to conventional seeds. Given that one 50-pound bag of seed is sufficient to plant about an acre of farmland, the savings of $31 to $61 per acre was equivalent to a savings of $31 to $61 per bag of seed. Based on those advantages alone, it was reasonable for the jury to suppose that, in a hypothetical negotiation, a purchaser would pay a royalty of $40 per bag for the Roundup Ready seed. The jury's verdict was therefore justified even without considering some of the other more sharply controverted aspects of the expert's valuation opinion, such as his use of a multiplier to account for the risks to Monsanto from infringement by farmers.

In reviewing damages awards in patent cases, we give broad deference to the conclusions reached by the finder of fact. As we explained recently in another "saved seed" case, a jury's damages award "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork." Monsanto Co. v. Ralph, 382 F.3d at 1383, quoting Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.3d 1555, 1560 (Fed. Cir. 1992). In this case, we hold that the jury's verdict was supported by evidence and was not

grossly excessive, particularly in light of the evidence of the savings Mr. McFarling achieved by his infringement, the benefits to Monsanto from requiring farmers to adhere to the terms of its standard licensing agreement, and the benefits conferred by the patented technology over the use of conventional seeds.

B

As a separate challenge to the damages award, Mr. McFarling argues that a new trial should be granted because the district court abused its discretion by permitting Monsanto's expert Mark Hoffman to testify at trial. Mr. Hoffman's testimony related to the amount of a reasonable royalty for Mr. McFarling's use of the invention.

Mr. McFarling asserts that Mr. Hoffman's testimony is inadmissible under the principles of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and was merely a "subjective opinion as to the value of Roundup Ready seed" by a person who was neither a farmer nor an agronomist. The district court, however, ruled that Mr. Hoffman, a certified valuation analyst, was qualified to address the issue of valuation. The court found that the objections to Mr. Hoffman's testimony "go to whether the jury should believe the witness or credit his opinions, instead of to whether the opinions have a reasonable basis and meet the Daubert requirements." In light of Mr. McFarling's objections, we hold that the district court did not abuse its discretion in admitting Mr. Hoffman's testimony. We therefore uphold the trial court's judgment as to the quantum of damages.

IV

The district court enjoined Mr. McFarling from infringing the '605 patent by planting any seed harvested from a crop of Roundup Ready soybeans, "except that Mr.

McFarling may plant Roundup Ready soybeans acquired from any lawful dealer, but to do so McFarling must sign any applicable technology agreement required by Monsanto." Monsanto objects to that clause in the court's decree because Monsanto understands the clause as requiring it to issue a standard license to Mr. McFarling if he agrees to comply with the license terms.

We do not understand the injunction to compel Monsanto to license its technology to Mr. McFarling if it chooses not to. Rather, the injunction simply reflects that if Monsanto enters a binding technology agreement with Mr. McFarling through a dealer, then Monsanto will have licensed Mr. McFarling to engage in conduct that would otherwise infringe the '605 patent; the injunction will not prohibit that licensed conduct.

Monsanto's real concern may be that, in light of the complexity and scale of its distribution and licensing system, it may enter into a binding license with Mr. McFarling even if it does not wish to do so. Thus, Monsanto requests that we direct the district court to enjoin Mr. McFarling from obtaining Roundup Ready soybean seed absent "express authorization from Monsanto."

We decline that invitation. The district court acted well within its discretion in not enjoining conduct that would not infringe Monsanto's patent. It is up to Monsanto, not the district court, to ensure that Monsanto's representatives do not enter into a binding contract with Mr. McFarling absent "express authorization from Monsanto" or whatever other licensing standard Monsanto wishes to adopt. We therefore reject Monsanto's challenge to the district court's injunction.

Each party shall bear its own costs for this appeal and cross-appeal.

<u>AFFIRMED</u>.

05-1570,-1598                                                14