**MONSANTO COMPANY,**
Plaintiff–Appellee,

v.

**Kem L. RALPH, (individually and doing business as Ralph Brothers Farms), Defendant–Appellant.**

Nos. 03–1243, 04–1001.

United States Court of Appeals, Federal Circuit.

Sept. 7, 2004.

Rehearing and Rehearing En Banc Denied Oct. 21, 2004.

Seth P. Waxman, Wilmer Cutler Pickering LLP, of Washington, DC, argued for plaintiff-appellee. With him on the brief was Joseph C. Orlet, Husch & Eppenberger, LLC, of St. Louis, Missouri.

James L. Robertson, Wise Carter Child & Caraway P.A., of Jackson, Mississippi, argued for defendant-appellant.

Before LOURIE, GAJARSA, and PROST, Circuit Judges.

LOURIE, Circuit Judge.

Kem L. Ralph appeals from two final judgments of the United States District Court for the Eastern District of Missouri: (1) a July 12, 2002, judgment on orders of October 10, 2001, striking Ralph's pleadings under Fed.R.Civ.P. 37(b), and February 15, 2002, imposing monetary sanctions for discovery abuses, intentional violation of court orders, and repeated attempts to conceal his misconduct, *Monsanto Co. v. Ralph*, No. 4:00CV135 RWS (E.D.Mo. July 12, 2002); and (2) a July 9, 2003, judgment entering a jury award to Monsanto of nearly three million dollars in damages for patent infringement, or, in the alternative, breach of contract, and granting Monsanto's motion for permanent injunction, *Monsanto Co. v. Ralph*, No. 4:00CV135 RWS (E.D.Mo. July 9, 2003) ("*2003 Judgment*"). Ralph also appeals from the September 3, 2003, order of the trial court denying Ralph's post-judgment motion to set aside the jury's award of damages for patent infringement. *Monsanto Co. v. Ralph*, No. 4:00CV135 RWS (E.D.Mo. Sept. 3, 2003). Because we hold that the contract-based damages are excessive in light of our recent decision in *Monsanto Co. v. McFarling*, 363 F.3d 1336 (Fed.Cir.2004) ("*McFarling*"), but that the trial court did not abuse its discretion in its choice of sanction or its denial of Ralph's post-judgment motion, and that Ralph has not shown that the larger jury award for patent infringement is unlawful, clearly not supported by the evidence, or based only on speculation or guesswork, we vacate-in-part and affirm-in-part.

## BACKGROUND

As explained in greater detail in *McFarling*, Monsanto developed and patented recombinant gene sequences that can be inserted into plant seeds to protect them against the effects of glyphosate-based herbicides, enabling farmers to spray herbicides such as Monsanto's Roundup® over their fields to kill weeds and other undesirable plants without killing the desired crops that grow from those seeds. Monsanto also developed and patented recombinant gene sequences encoding proteins that are toxic to certain insects that commonly cause significant damage to host plants. When those sequences are incorporated into seeds, the resulting plants produce, in effect, their own insecticide. Monsanto provides nonexclusive, restricted-use licenses to various seed companies, which manufacture seed containing the two patented technologies described above and sell those seeds under the Roundup–Ready® and Bollgard® brand names, respectively. Monsanto additionally requires retailers to execute standardized contracts with growers before selling Roundup–Ready® or Bollgard® seed to them.

Mr. Ralph is a farmer who resides in western Tennessee. Together with his brother Roger, he operates Ralph Brothers Farms, a partnership that grows cotton, soybeans, and corn in Tennessee's Tipton, Shelby, and Haywood Counties. In 1998, Ralph purchased 264 fifty-pound bags of soybean seed containing the patented Roundup–Ready® biotechnology. In 1999, he purchased 127 fifty-pound bags of cottonseed, containing both the Roundup–Ready® biotechnology and the Bollgard® biotechnology (hereinafter, "stacked-trait" cottonseed). According to the contract that was in use at the time that Ralph purchased the Roundup–Ready® soybean seed and stacked-trait cottonseed (*i.e.*, the "Technology Agreement"), the farmer, or "grower," was required, in exchange for the opportunity to purchase and plant seed containing the Roundup–Ready® and/or Bollgard® technology, to agree, *inter alia:*

> To use the seed containing Monsanto gene technologies for planting a commercial crop only in a single season.
>
> To not supply any of this seed to any other person or entity for planting, and to not save any crop produced from this seed for replanting, or supply saved seed to anyone for replanting.
>
> To not use this seed or provide it to anyone for crop breeding, research, generation of herbicide registration data or seed production.

The Technology Agreement also contained a forum-selection clause, conferring personal jurisdiction over the grower in the Eastern District of Missouri, and a clause specifying damages in the event of breach by the Grower. The latter clause reads as follows:

> In the event that the Grower saves, supplies, sells or acquires seed for replant in violation of this Agreement and license restriction, in addition to other remedies available to the technology provider(s), the Grower agrees that damages will include a claim for liquidated damages, which will be based on 120 times the applicable Technology Fee.

At the time Ralph purchased the aforementioned seeds, the Technology Fee, which was built into the price of each seed bag, was $5.00/bag for Roundup–Ready® soybean seed and $112.80/bag for stacked-trait cottonseed.

The district court found that Ralph saved 796 bags of Roundup–Ready® soybean seeds and 108 bags of stacked-trait cottonseed at the end of the 1998 harvest for planting in the 1999 growing season, in

contravention of the Technology Agreement. According to the court, Ralph again illicitly saved seed in 1999 for planting in 2000: 438 bags of Roundup–Ready® soybean seeds and 817 bags of stacked-trait cottonseed.

After an investigation indicated that Ralph might have saved and re-planted patented seeds, Monsanto filed suit against Ralph in the district court on January 28, 2000, asserting claims for, *inter alia,* willful infringement of Monsanto's U.S. Patents 5,164,316, 5,196,525, 5,322,938, 5,352,-605, and 5,633,435, and breach of contract. On February 10, 2001, Ralph filed a Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, in which he asserted that he had no contacts with Missouri and should not be required to defend a case there. *Monsanto Co. v. Ralph,* No. 4:00CV135 RWS, slip op. at 3 (E.D.Mo. Feb. 15, 2002) ("*2002 Order* "). The court found that assertion to be untrue, as it was discovered thereafter that Ralph had been doing business with Sinkers Corporation in Kennett, Missouri, for over twenty years in matters directly related to the underlying claims in this case. *Monsanto Co. v. Ralph,* No. 4:00CV135 RWS, slip op. at 22–23 (E.D.Mo. Oct. 10, 2001) ("*Sanction Hearing Transcript* ").

That same month, when Monsanto arrived to sample Ralph's crops, to which Ralph had previously consented, Ralph revoked his consent, forcing Monsanto to obtain an order from the district court permitting it to enter. *2002 Order,* slip op. at 4. The court granted the order on February 24, and, based on Ralph's misrepresentation that he would need to plant his seed by March 1,[1] the court's order gave Monsanto until that date to investigate. Ralph initially represented under oath that he had not stored any seed, but the district court found that, after being confronted with evidence from Sinkers that he had stored cottonseed there, he admitted that the seed had existed. *Sanction Hearing Transcript,* slip op. at 27. However, according to the court, Ralph testified that he had violated the court's order and burned all of the stored seed. *Id.* He offered to stipulate that those bags all contained Monsanto's patented stacked-trait cottonseed. *2002 Order,* slip op. at 4. Monsanto rejected that offer, apparently suspecting that Ralph may again have been lying and that he may have sold or transferred some of those bags to other farmers. *Id.* at 4–5. In fact, after deposing Kem and Roger Ralph and filing a motion for sanctions for their misconduct, Monsanto deposed the operator of the dump where Ralph allegedly burned the seed, who stated that it appeared to him that Ralph had burned only about a hundred bags and that Ralph told him he had burned 700 bags, *id.* at 5, out of the more than 1800 bags of seed that the court found that Ralph had stored at Sinkers, *Sanction Hearing Transcript,* slip op. at 30. Monsanto also deposed three other farmers, Norman Kelly, David Bradshaw, and DeWayne Hendrix, all of whom declared under oath that Ralph had sold or given stacked-trait cottonseed to them. *2002 Order,* slip op. at 5–6. Monsanto then renewed its Motion for Sanctions. The court found that Ralph had engaged in additional, intentional obstruction of the discovery process by, *inter alia,* failing to inform Monsanto of his complete land holdings and failing to disclose the stored cottonseed at Sinkers in response to Monsanto's interrogatories, and by requiring Monsanto to take depositions of witnesses

---

1. The district court found that Ralph did not begin tilling his fields until April 1 each year.

*Sanction Hearing Transcript,* slip op. at 22.

that would not have been necessary if it had not been for Ralph's refusal to cooperate. *Id.* at 6–7.

At a hearing held on October 10, 2001, the court exercised its discretion under Fed.R.Civ.P. 37(b) to sanction Ralph by striking all of his pleadings in the case as a penalty for, *inter alia,* intentionally violating court orders and repeatedly lying under oath. *Sanction Hearing Transcript,* slip op. at 33. The court concluded that that was the only appropriate remedy, because "Monsanto, like the Court, will never have any comfort that it knows the truth, and that it can properly prepare this case for trial.... The integrity of this Court and our judicial system ... has been undermined by almost every aspect of the Ralph Brothers [sic] conduct in this case." *Id.* The court entered judgment for Monsanto on liability and ordered the case to trial on damages only. The court additionally asked Monsanto to brief its costs and expenses incurred as a result of Ralph's deceptive conduct, refusal to comply with the court's orders, and lying about those refusals. *Id.* at 34. On February 15, 2002, the court ordered Ralph to reimburse Monsanto $104,506.47 for its expenses. *2002 Order,* slip op. at 8.

On December 12, 2002, after hearing Monsanto's witnesses, the jury returned a verdict for Monsanto for what it deemed to be a reasonable royalty for Ralph's infringement, *viz.,* $55.04/bag for the 796 bags of soybean seed that Ralph saved for planting in 1999, $548.00/bag for the 108 bags of cottonseed that he saved for 1999, $52.12/bag for the 438 bags of soybean seed he saved for 2000, $556.80/bag for the 817 bags of cottonseed he saved for 2000, and $1113.36/bag for 200 bags of cottonseed that he transferred to Kelly, for a total of $803,402. The court trebled that

amount for willfulness and added $178,036.51 for prejudgment interest, $57,833.20 for costs, and $291,451.36 for attorney fees, resulting in a total award of $2,937,527.07 for patent infringement. The jury also awarded Monsanto, in the alternative, $1,877,472 in liquidated damages under the Technology Agreement (*i.e.,* 120 times the $5.00 technology fee for each of the 264 bags of soybean seed that Ralph purchased, plus 120 times the $112.80 technology fee for each of the 127 bags of cottonseed that he purchased). After adding prejudgment interest, costs, and attorney fees, the court granted a total award of $2,741,543.95 for the breach of contract. Because the patent infringement and breach of contract claims were filed in the alternative, the court concluded that satisfaction of the higher patent infringement award would extinguish the lesser breach of contract award. *2003 Judgment,* slip op. at 2. Finally, the court entered a permanent injunction prohibiting Ralph's "current and future purchase, acquisition, making, use, sale, offers to sell, brokering, transfer, cleaning, and/or reconditioning ... of any seed containing Monsanto's patented biotechnology ... [or] planting, moving, collecting transferring, or obtaining, in any manner, any patented biotechnology in [his] possession, or under [his] control, wherever situated," and ordering him to inventory and produce all patented biotechnology in his possession to Monsanto. *Id.* at 3.

Ralph timely appealed the court's judgment.[2] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION

A. *Sanctions*

On appeal, Ralph argues that the district court abused its discretion by striking

---

**2.** In January 2003, Ralph also filed a Post–Judgment Motion for Judgment as a Matter of Law Notwithstanding the Verdict of the Jury and/or for a New Trial and/or for a Remittitur. The court denied that motion on September 3, 2003.

his pleadings and entering judgment for Monsanto on liability. According to Ralph, "if Kem Ralph has been less than completely forthcoming in some of his responses ..., it was because he realized that complete answers would get his friend [Hendrix] in trouble." Ralph apparently asserts that such a display of loyalty should have mitigated his sanctions, stating that "[t]he desire to protect a friend is never a justification for telling less that [sic] the complete truth in response to questions properly put in a judicial proceeding. But it certainly does go to good faith and the question of what price the party must pay." Ralph further contends that his attempt to keep Monsanto from finding out about the Sinkers-stored seed was in any event ineffectual, because Monsanto was ultimately able to unearth all of the facts on its own. He also argues that he did not actually violate an "order to provide or permit discovery," Fed.R.Civ.P. 37(b)(2), because, he claims, the only order arguably sufficient by its own terms had expired on March 1, 2000, the day before he burned the seed. He contends that the appropriate sanction for intentional spoliation of evidence would have been simply to declare a rebuttable presumption that all of the Sinkers-cleaned cottonseed contained the patented traits, just as he had offered to stipulate. Further, according to Ralph, the truth regarding three out of Monsanto's four claims, *i.e.*, those with regard to saved soybean seed and cottonseed planted in 1999 and saved soybean seed planted in 2000, was never in doubt, as any concealment related only to cottonseed saved for planting in 2000. Ralph argues that the court should have considered his defenses, especially those purporting to show that the '435 patent is invalid for failure to disclose the best mode of the invention, that his signature was forged on the Technology Agreement, and that he never sold any seed to Kelly. Ralph also

argues that there are strong public policy reasons why he should be allowed to pursue patent misuse and anti-competitive conduct affirmative defenses and counterclaims.

Monsanto responds by arguing that the district court's sanction was commensurate with Ralph's deliberate and wide-ranging abuses. According to Monsanto, no lesser sanction would have served the purposes of punishment and deterrence. In particular, Monsanto asserts, a spoliation instruction would have improved Ralph's position, rather than sanctioning him, because it would have covered up the fact that Ralph actually sold and/or transferred some seed. Monsanto further argues that the district court's selection of sanction is entitled to substantial deference and the court did not abuse its discretion by striking Ralph's pleadings.

In reviewing sanction orders, this court applies the law of the regional circuit from which the case arose, in this case the Eighth Circuit. *Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1370 (Fed.Cir.2002). "[W]hether the extent of a sanction is appropriate is a question peculiarly committed to the district court." *Dillon v. Nissan Motor Co.*, 986 F.2d 263, 268 (8th Cir.1993). District courts have wide latitude in fashioning an appropriate sanction, *Aziz v. Wright*, 34 F.3d 587, 588 (8th Cir.1994), and, in particular, the Eighth Circuit has held in a case involving less egregious discovery abuses than at issue here that

> striking a party's pleadings under Rule 37 is within the range of appropriate sanctions when a party demonstrates a blatant disregard of the Court's orders and the discovery rules, engaging in a pattern of deceit by presenting false and misleading answers and testimony under oath in order to prevent their opponent from fairly presenting its case.

*Chrysler Corp. v. Carey,* 186 F.3d 1016, 1022 (8th Cir.1999) (internal quotation marks omitted).[3]

■ We agree with Monsanto that there was reasonable basis for the court's sanctions. The spoliation instruction that Ralph argues should have been given as a sanction instead would simply have created a presumption that all 1879 bags of Sinkers-stored seed contained the patented traits and were burned. That sanction would have trivialized the magnitude of the harm caused by Ralph's behavior, because if the seed had simply been burned, there would have been little basis for Monsanto to argue that it would suffer any continuing harm as a result of Ralph's saving of that seed, and Monsanto might not have been adequately compensated. However, most of those 1879 bags are unaccounted for and there is evidence that at least some of that seed was transferred to others. The potential risk to Monsanto's business from such a transfer goes far beyond any harm that would have come from Ralph's burning seed, because of the exponential growth rate of the seeds. For example, the Environmental Protection Agency requires county-by-county monitoring of Bollgard® cottonseed to control environmental impact and ensure efficacy. Violation of the limited-use restriction set forth in the Technology Agreement could have caused Monsanto to lose control over the technology, because a single Bollgard® cottonseed produces a plant that yields 70 to 120 patented seeds. Even a single bag of the cottonseed transferred to another farmer could therefore, by a conservative estimate, produce hundreds of thousands of bags of seed (*i.e.,* $70 \times 70 \times 70 =$ 343,000) over the course of just three growing seasons.

Although Ralph has cited several cases in which the Eighth Circuit reversed dismissal sanctions, including *Edgar v. Slaughter,* 548 F.2d 770 (8th Cir.1977), *Baker v. General Motors Corp.,* 86 F.3d 811 (8th Cir.1996), *rev'd on other grounds,* 522 U.S. 222, 118 S.Ct. 657, 139 L.Ed.2d 580 (1998), and *Heartland Bank v. Heartland Home Finance, Inc.,* 335 F.3d 810 (8th Cir.2003), those cases did not involve findings of willful violation of court orders, destruction of evidence, or subornation of perjury, as were present in this case. As the Eighth Circuit explained in *Denton v. Mr. Swiss of Missouri, Inc.,* 564 F.2d 236 (8th Cir.1977), "[t]he judicial system cannot tolerate litigants who flagrantly refuse to comply with the orders of the court and who refuse to make discovery, for delay and evasion are added burdens on litigation, causing waste of judicial and legal time, are unfair to the litigants and offend the administration of justice." *Id.* at 241.

■ As for Ralph's argument that the court order that the district court found that he had violated had already expired when he supposedly burned the seed, we agree with Monsanto that Ralph was not entitled to the benefit of the March 1 cut-off date set by the court because that date was based on Ralph's perjurious affidavit regarding the date on which he intended to prepare his fields. Moreover, Ralph has not shown that he did not transfer any seed prior to that date, and he certainly did not demonstrate that he had given Monsanto access to the 1879 bags during the pendency of the order. On the contrary, the record suggests that Ralph actively concealed the existence of those

---

**3.** In *Chrysler,* the sanctioned defendants had withheld evidence by denying its existence. Going far beyond that mere concealment of evidence in *Chrysler,* Ralph was found to have destroyed some of the evidence and then apparently lied about destroying the remainder of the evidence to further conceal his actions.

bags by leaving them at Sinkers until he believed that the order had expired. In fact, according to the district court, Ralph had represented under oath during the pendency of the order that there was no stored seed. *Sanction Hearing Transcript,* slip op. at 27. We find no abuse of discretion in the court's refusal to allow Ralph to benefit from his own perjury. Furthermore, as Monsanto points out, the district court has the inherent power under section 37 to sanction abuses of the judicial process irrespective of the existence of any particular order.

■■■■ Ralph's arguments that his conduct would only have affected one out of four claims in this case and that he concealed information only to protect his friend Hendrix are similarly unavailing. The district court justifiably concluded that Ralph's subornation of perjury and lying under oath with respect to cottonseed saved in 2000 cast a pall of doubt over all of his defenses. According to the court, "lies ... compounded upon lies.... The violations [were] willful and continuing. The defendants ... engaged in a systematic pattern of lying to keep the truth from being discovered in this case," *Sanction Hearing Transcript,* slip op. at 30–31, and it was only when confronted with objective evidence that Ralph would purport to come clean, at which time he would "come forward and tell another story.... [T]he Court's only conclusion is that they changed their story to fit the moving target of the truth," *id.* at 28. Not only did Ralph destroy evidence, but in doing so he also knowingly violated the court's orders and he was found to have lied under oath with regard to the extent of the destruction. As a result, the court concluded that it had "no confidence that we will ever know the truth in this case," and that "[w]henever given the chance to tell the truth, the defendants have consistently

chosen dishonesty." *Id.* at 31. We conclude, therefore, that the court did not abuse its discretion by refusing to limit its sanctions to the cottonseed saved for 2000. With respect to Ralph's argument that he was trying to protect Hendrix, we agree with the district court that "[l]ying to protect a friend is lying, pure and simple. Lying to give an alibi to another criminal is punishable.... Lying to protect a friend is nothing more than lying." *Id.* at 28.

■■■■ Ralph's argument that Monsanto was not prejudiced by any of his perjured testimony because Monsanto uncovered all the facts on its own misses the point, because it fails to take into account that Monsanto had to take costly steps to uncover facts that Ralph was obligated to provide voluntarily. Moreover, because the district court found that the full truth could not be ascertained, the full extent of the prejudice to Monsanto from Ralph's deceit is likewise unknowable. Further still, even if there was no harm at all to Monsanto, Ralph's conduct undermined the integrity of the court and the judicial system, and sanctions would have been warranted on that basis alone. Finally, although we agree with Ralph that there are important public policy reasons to allow an accused infringer to prove that patents asserted against him are invalid or unenforceable, Ralph gave up the right to attempt to fulfill that role when he violated the court's orders and lied to the court. Accordingly, for the foregoing reasons, we conclude that the district court did not abuse its discretion by striking Ralph's pleadings.

B. *Reasonable Royalty Damages*

Ralph next argues that he is entitled to a new trial on damages for patent infringement. In particular, he contends that the court erred by refusing to limit damages to a reasonable royalty for the use that he

actually made of the seed, rather than for the uses that he could potentially have made and that he has now been enjoined from making. According to Ralph, a reasonable royalty deduced through a hypothetical negotiation process can never be set so high that no rational self-interested wealth-maximizing infringer acting *ex ante* would ever have agreed to it. More particularly, Ralph asserts that *Georgia–Pacific Corp. v. United States Plywood Corp.,* 318 F.Supp. 1116 (S.D.N.Y.1970), *award modified and aff'd,* 446 F.2d 295 (2d Cir. 1971), requires that an infringer be given a reasonable opportunity *ex ante* to make a profit. Ralph also contends that there was no need for a hypothetical negotiation in this case, because, he argues, lost profits were shown and those should have been the measure of damages. Even if lost profits had not been shown, Ralph argues, the standard Technology Fee that Monsanto charges all farmers is "the most established royalty patent infringement litigation has ever seen."

Monsanto responds that the jury's award reasonably reflects that Ralph misappropriated a license to use the seed without restrictions, as his infringing use extended well beyond the licensed planting of a commercial crop for a single growing season. Counsel for Monsanto also asserted during oral argument that the assessed $55.04/bag and $52.12/bag reasonable royalty damages for saved and replanted soybean seed and the $548.00/bag and $556.80/bag reasonable royalty damages for saved and replanted cottonseed are all reasonable royalties for licenses to save and replant for a single year; and that $1113.36/bag is a reasonable royalty for a license to save and transfer cottonseed, notwithstanding the fact that Monsanto would not agree to ever grant any such unlimited licenses.

■ We agree with Monsanto that the court did not err in its determination of a reasonable royalty and its denial of Ralph's post-trial motion. The jury's award of damages is entitled to deference. Specifically, the jury's damages award "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1580 (Fed.Cir.1992) (internal quotation marks omitted). The record in this case reveals that the jury was instructed in the factors set forth in *Georgia–Pacific* for determination of a reasonable royalty and based its determination of a reasonable royalty on the testimony of an expert witness who was cross-examined by Ralph's attorney. Although that witness was hired by Monsanto, the jury apparently found his testimony to be credible, and awarded approximately 80% of the damages established by his analysis. Ralph chose to withdraw his own expert witness on the day on which he was to testify, and he therefore cannot complain that the only witness that testified was on Monsanto's payroll. In any event, Ralph has not satisfied his burden of showing that "the award is, in view of all the evidence, either so outrageously high or so outrageously low as to be unsupportable as an estimation of a reasonable royalty." *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.,* 895 F.2d 1403, 1406 (Fed.Cir.1990).

■ Ralph's suggestion that the Technology Fee is an established royalty for the use that he made of the seed can be rejected as unsound. One of the most fundamental tenets of patent law is that a patent gives its owner the right to exclude others from making, using, selling, offering to sell, or importing the patented subject matter. 35 U.S.C. § 271 (2000). If the

patent owner chooses not to totally exclude others, he or she may negotiate with a potential licensee to permit the licensee to make, use, sell, or import the patented subject matter under whatever terms the parties agree upon. Monsanto has chosen, as is its prerogative, to permit farmers to plant a commercial crop of the patented seeds in a single season in exchange for payment of the Technology Fee and a promise, manifested through the Technology Agreement, not to save those seeds that are harvested at the end of the growing season for replanting, production, sale, or transfer to others. The Technology Fee is a royalty, to be sure, but it is a royalty for only a narrow, contractually agreed-upon, use of the seed. It is undisputed in the record that Monsanto has not granted licenses to anyone to plant, produce, or transfer saved seed. The Technology Fee is therefore not an established royalty for planting or transferring saved seed, the uses that Ralph made of the patented invention.

■ Ralph argues that no sane farmer would ever negotiate a royalty in excess of his anticipated profits. However, although an infringer's anticipated profit from use of the patented invention is "[a]mong the factors to be considered in determining" a reasonable royalty, *see Georgia–Pacific*, 318 F.Supp. at 1120, the law does not require that an infringer be permitted to make a profit. And, where, as here, a patentee is unwilling to grant an unlimited license, the hypothetical negotiation process has its limits. As we explained in *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320 (Fed. Cir.1987), the "imposition on a patent owner who would not have licensed his invention for [a given] royalty is a form of compulsory license, against the will and interest of the person wronged, in favor of the wrongdoer." *Id.* at 1328; *see also*

*Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n. 13 (Fed.Cir.1995) ("The hypothetical negotiation is often referred to as a 'willing licensor/willing licensee' negotiation. However, this is an inaccurate, and even absurd, characterization when, as here, the patentee does not wish to grant a license."). Just as Ralph asserts that he would never pay Monsanto such a royalty just to be able to save seed for replanting or transfer, Monsanto would apparently never permit Ralph to save seed for replanting or transfer at any price.

■ Because denials of motions for judgment as a matter of law, remittitur, or new trial are not unique to patent law, we apply regional circuit law in our review of those decisions. Under the Eighth Circuit's case law, the district court's denial of such motions is reviewed for "manifest abuse of discretion or a verdict that is so grossly excessive as to shock the conscience." *MacGregor v. Mallinckrodt, Inc.*, 373 F.3d 923, 932 (8th Cir.2004). We have held that a court has wide discretion in making the determination denying such a motion, *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed.Cir.1995), and that a court should grant such a motion only if "the jury's verdict is against the clear or great weight of the evidence," *Standard Havens Prods. v. Gencor Indus.*, 953 F.2d 1360, 1367 (Fed.Cir.1991). We see no abuse of discretion in this case, as the jury's determination on reasonable royalties was supported by the evidence of record and was properly accepted by the district court in its denial of Ralph's motion.

## C. *Liquidated Damages*

Finally, Ralph contends that the liquidated damages clause in the Monsanto Technology Agreement constitutes an unenforceable penalty, rather than a measure

of compensation, and that he is entitled to judgment as a matter of law on that issue.

Even if the clause is enforceable, Ralph argues that he did not agree to it, and that his signature was forged on the Monsanto Technology Agreement.

Monsanto responds that the 120 multiplier in the liquidated damages clause of the Monsanto Technology Agreement was appropriate because the extent of the harm to Monsanto caused by a breach was difficult to predict *ex ante*. Monsanto's arguments in support of the 120 multiplier are similar to those that it presented in *McFarling,* in which we vacated and remanded a jury verdict awarding damages calculated using the 120 multiplier on the basis that it offends Missouri state law. *McFarling,* 363 F.3d at 1347–50. In that case, we concluded that the "one-size-fits-all" 120 multiplier failed to distinguish between the various modes of breaching the contract. *Id.* at 1348 ("The 120 multiplier in the Technology Agreement also violates the anti-one-size rule because it specifies the same measure of damages in the event of breach of several different restrictive provisions of the contract that lead to different types of damages."). The same defect is present in this case, and at oral argument counsel for Monsanto conceded the point. Moreover, because the damages awarded to Monsanto for Ralph's infringement of its patents exceed the liquidated damages awarded for breach of contract, and the district court held that "satisfaction of the higher damages amount by the defendants shall extinguish the alternate damages amount," *2003 Judgment,* slip op. at 2, we see no reason to remand the case to the district court to determine an appropriate damages award for breach of the Technology Agreement.

We have considered Ralph's other arguments and find them unpersuasive.

## CONCLUSION

Although we have determined that the contract-based damages are excessive in light of our recent decision in *McFarling,* the trial court did not abuse its discretion in its choice of sanction or its denial of Ralph's post-judgment motion, and Ralph has not shown that the jury award for patent infringement is "grossly excessive or monstrous," clearly not supported by the evidence, or based only on speculation or guesswork. Accordingly, the decision of the district court is

*VACATED–IN–PART AND AF-FIRMED–IN–PART.*