Opinion for the court filed by Circuit Judge DYK. Dissenting-in-part opinion filed by Circuit Judge WALLACH.
DYK, Circuit Judge.
WesternGeco L.L.C. (“WesternGeco”) filed suit against ION Geophysical Corp. (“ION”) for infringement of, inter alia, U.S. Patent Nos. 6,691,038 (“the '038 patent”), 7,080,607 (“the '607 patent”), 7,162,-967 (“the '967 patent”), and 7,293,520 (“the '520 patent”). The jury found infringement and no invalidity with respect to all asserted claims for each of the four pat *1343 ents, and awarded $93,400,000 in lost profits and $12,500,000 in reasonable royalties.
ION appeals, arguing that WesternGeco is not the owner of the '607, '967, and '520 patents and therefore lacks standing to assert them; that the district court applied an incorrect standard in granting summary judgment as to claim 18 of the '520 patent under 35 U.S.C. § 271(f)(1) and that this ruling infected the trial with respect to liability for all other claims; and that lost profits were impermissibly awarded for conduct abroad.
WesternGeco conditionally cross-appeals, arguing that, if we find in favor of ION with respect to any of its appealed issues, we should set aside the damages award because the district court erred in preventing WesternGeco’s damages expert from testifying on the issue of a reasonable royalty. WesternGeco also challenges the district court’s refusal to award enhanced damages for willful infringement.
We affirm in all respects, except that we reverse the district court’s award of lost profits resulting from conduct occurring abroad.
Background
WesternGeco asserts that it owns the four patents at issue: the '038 patent, the '607 patent, the '967 patent, and the '520 patent. The asserted claims of all four patents are system claims relating to technologies used to search for oil and gas beneath the ocean floor. To search for oil and gas, ships tow a series of long streamers. Each streamer is equipped with a number of sensors. An airgun bounces sound waves off of the ocean floor. The sensors pick up the returning sound waves and, in combination with each other, create a map of the subsurface geology. This generated map can aid oil companies in identifying drilling locations for oil or gas.
The streamers can be miles in length, and vessel movements, weather, and other conditions can cause the streamers to tangle or drift apart. This, in turn, can cause the sensors on the streamers to generate imperfect or distorted maps. The patents here relate to two improvements to that technology: first, controlling the streamers and sensors in relation to each other through the use of winged positioning devices; second, using the sensors to generate four-dimensional maps — that is, maps in which it is possible to see changes in the seabed over time.
Both parties are involved in this industry. WesternGeco manufactures its commercial embodiment of the patented technologies, the Q-Marine, and performs surveys on behalf of oil companies. ION manufactures its allegedly patent-practicing device, the DigiFIN, and sells that •device to its customers, who perform surveys on behalf of oil companies.
On June 12, 2009, WesternGeco filed suit against ION, accusing ION of willfully infringing various claims of four patents. WesternGeco’s theory of infringement was based on, inter alia, 35 U.S.C. § 271(f)(1) and § 271(f)(2). Broadly speaking, (f)(1) prohibits supplying a substantial portion of the components of a patented system in a manner that actively induces their combination abroad, and (f)(2) prohibits supplying components that are especially adapted to work in a patented invention and intending that the components be combined abroad in a manner that would infringe if combined domestically. See 35 U.S.C. § 271(f).
Oh June 29, 2012, the court granted summary judgment of infringement in favor of WesternGeco for claim 18 of the '520 patent under 35 U.S.C. § 271(f)(1). In so ruling, the court interpreted § 271(f)(1) as requiring that the “alleged infringer (1) actively induce the combination of the components in question; and (2) that the combination of those components *1344 would infringe the patent if such combination occurred within the United States.” J.A. 52. Section 271(f)(2), the district court concluded, required a heightened standard: “that the defendant (1) intended the combination of components; (2) knew that the combination he intended was patented; and (3) knew that the combination he intended would be infringing if it occurred in the United States.” J.A. 55. The court determined that WesternGeco proved that ION intended that the components be combined and therefore infringed under § 271(f)(1) with respect to claim 18, but concluded that, with respect to claim 18 under § 271(f)(2), there was a genuine issue of material fact as to whether the “Defendants knew that the combination was infringing.” J.A. 56.
Trial was held in July and August of 2012. On August 16, 2012, the jury rendered its verdict, finding that ION infringed claims 19 and 23 of the '520 patent, claim 15 of the '967 patent, claim 15 of the '607 patent, and claim 14 of the '038 patent under §§ 271(f)(1) and (f)(2). The jury also found that ION infringed claim 18 of the '520 patent under § 271(f)(2) (infringement under (f)(1) as to claim 18 having already been decided on summary judgment). Finally, the jury found that the infringement was willful (applying the so-called “subjective” prong of In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed.Cir.2007) (en banc)). The jury awarded $93,400,000 in lost profits and $12,500,000 in reasonable royalties.
ION filed motions for judgment as a matter of law or for a new trial. ION also filed a motion to dismiss, for the first time alleging that WesternGeco did not have standing to assert the '607 patent, the '967 patent, and the '520 patent because West-ernGeco did not own the patents. West-ernGeco filed, inter alia, a motion for enhanced damages under 35 U.S.C. § 284.
On June 19, 2013, the district court denied ION’s JMOLs and motion to dismiss and WesternGeco’s motion for enhanced damages, finding that ION’s positions were reasonable and not objectively baseless.
ION appealed. WesternGeco conditionally cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).
DISCUSSION
I
We first address ION’s contention that WesternGeco does not own the '607 patent, the '967 patent, and the '520 patent, and therefore lacked standing to assert them. The question is whether WesternGeco owned the patents when the suit was filed in 2009. It is uncontroverted that a sole owner of a patent has standing to assert it and that an entity that does not own the patent (or is not the exclusive licensee) does not have standing to sue. See Rite-Hite Corp. v. Kelley Co., Inc., 56 F.3d 1538, 1551-52 (Fed.Cir.1995) (en banc).
Although standing is reviewed de novo, we review factual determinations relating to standing for clear error. See Enovsys LLC v. Nextel Commc’ns, Inc., 614 F.3d 1333, 1340-41 (Fed.Cir.2010). The district court reviewed the parties’ arguments with respect to the chain-of-title and concluded that “WesternGeco has presented sufficient evidence to prove its ownership of the patents” and that ‘West-ernGeco was assigned the rights.” J.A. 7. We have reviewed the record relating to the chain of title between the original inventors and WesternGeco. We conclude that the district court’s findings are not clearly erroneous.
The three patents each list two inventors: Oyvind Hillesund and Simon Bittle-ston. In 1993, Bittleston started working for a subsidiary of Schlumberger Ltd., and Hillesund started working for a subsidiary *1345 of Schlumberger Ltd. the following year. Schlumberger Ltd. is one of the world’s largest oil and gas companies, incorporated in Curacao and with offices throughout the world. Although the precise Schlum-berger corporate structure existing in the early 1990s is not clear from the record, and it is not clear precisely for which subsidiaries Bittleston and Hillesund worked at the time of their invention, ION admits that Hillesund and Bittleston worked for so-called “Geco” subsidiaries of Schlumberger Ltd. See Appellant’s Br. 10 (characterizing Hillesund and Bittleston as having “originally went to work for Geco in” 1994 and 1993, respectively).
Both inventors testified that they transferred their rights to the inventions they developed to their employers pursuant to their employment contracts. Bittleston testified: “[W]hen [Hillesund and I] joined the company [one of the Geco companies], we signed something saying that any inventions we made were going to be owned by the company, not by us, so they’re the owners.” J.A. 1504. Hillesund’s testimony is similar. When asked: “Mr. Hille-sund, as an employee of Geco and later WesternGeco, did you assign your rights of the intellectual property to the company?”, Hillesund responded: ‘Tes. Part of the — my contract was that intellectual property — there was also something in the contract that I was to be given reasonable coverage of — in the form of a bonus, all in accordance to the significance of the patent.” J.A. 12805.
If, in fact, Geco subsidiaries of Schlum-berger, Ltd. acquired those rights in the early 1990s, they were transferred to Schlumberger Technology Corporation (“STC”) pursuant to a 1998 agreement. In 1998, four Schlumberger companies, Schlumberger Holdings Limited, STC, Schlumberger Canada Limited, and Services Petroliers Schlumberger S.A., entered into a cost-sharing agreement. As a part of that agreement, the parties assigned intellectual property rights to each other to consolidate those rights on a geographical basis:
[O]wnership of the Patent Rights, Proprietary Technical Information and Copyrights which are subject to this Agreement shall be vested in the Participants in their Respective Areas....
J.A. 12828-29. STC’s “respective area” was the United States. J.A. 12820. The agreement defined “Patent Rights” to include “any and all patents and patent applications, certificates of invention and the like, throughout the world, and interests therein, based upon inventions relating to seismic oil field services or equipment which are obtained by or for the Geco Prakla companies.” J.A. 12824.[1] Thus, there is substantial evidence to conclude that the agreement here assigned the intellectual property in the Geco companies (originally assigned from the inventors) to STC in 1998.
The next event in the chain-of-title occurred in 2000, when Schlumberger and Baker-Hughes formed a joint venture, WesternGeco, to which STC assigned its intellectual property rights “primarily related to the Seismic Business in the U.S.”[2] *1346 J.A. 12780. And there is substantial evidence to conclude that the intellectual property at issue in this case is “primarily related to the Seismic Business” because a British application and Patent Cooperation Treaty (“PCT”) application, from which the three patents at issue derive, were expressly included in a list of IP used primarily for the Seismic Business.[3] As a result of this series of transfers, it appears that the inventors’ patent rights were transferred first to the Geco companies, then in 1998 to STC, and then in 2000 to WesternGeco, the plaintiff in this case.
However, ION argues that there is a defect in this chain of title. It contends that the inventors, while perhaps obligated to transfer rights in the invention to their employers (Geco subsidiaries) under their employment agreements, failed to testify that such a transfer in fact occurred. It is well-established that employment contracts do not necessarily automatically assign patent rights to the employer. See Abraxis Bioscience, Inc. v. Navinta LLC, 625 F.3d 1359, 1364 (Fed.Cir.2010). “[C]ontraets that obligate the owner to grant rights in the future do not vest legal title to the patents in the assignee.” Id. at 1364-65. In such circumstances, the employee must still formally assign the rights to the patent to the employer in order to convert the employer’s contractual right to the technology into a vested ownership interest.
The simple answer is that even if the inventors still owned the rights to the invention after the 2000 merger agreement, the inventors transferred their interests in the pending patent applications to STC in 2001. The 2001 assignment forms executed by each of the two inventors provided that “[STC] is desirous of acquiring or confirming its ownership of the entire right, title and interest in and to [the invention]” and confirmed that the inventors “have sold, assigned, transferred and conveyed, and by this assignment, do sell, assign, transfer and convey, unto Assignee, its successors and assigns, the entire right, title and interest throughout the United States ... in and to my invention.... ” *1347 J.A. 12195-98. These 2001 assignments were filed as to U.S. Patent Application No. 09/787,723 (“App. No. '723”) and PCTIB99/01590. As noted above, the three patents for which ION challenges ownership were all continuations of the patent resulting from App. No. '723. ION admits that STC was assigned the patents in 2001, and argues that STC is the patent owner.
No further transfer instrument from STC to WesternGeco was required to vest these patents in WesternGeco after the rights were transferred to STC in 2001. The transfer from STC to Western-Geco occurred automatically under the previously executed 2000 agreement. It is well-established that when an agreement provides for the transfer of an interest in a patent and the transferring party later receives formal title, the formal title is automatically transferred by operation of the prior agreement to the transferee party. See Abraxis, 625 F.3d at 1364 (“If [a] ‘contract expressly conveys rights in future inventions, no further act is required once an invention comes into being, and the transfer of title occurs by operation of law.’”); SiRF Tech., Inc. v. Int'l Trade Comm’n, 601 F.3d 1319, 1326 (Fed.Cir.2010) (same).[4]
Here, the 2000 merger agreement was a present assignment of STC’s rights to the intellectual property at issue. The merger agreement provided: “STC assigns to [WesternGeco] in accordance with Article 2 all right, title, and interest in and to the Schlumberger Transferred IP primarily related to the Seismic Business in the U.S.” J.A. 12780. Intellectual Property was defined to include: “patents, patent applications (filed, unfiled or being prepared),” and “inventions,” “including any being developed.” J.A. 12706. The 2000 assignment here included the rights to future patents resulting from the existence of a previous invention.
There is thus substantial evidence to conclude that WesternGeco owns the patents at issue and has standing to sue, regardless of whether the inventors transferred their rights to the inventions to the Geco companies by operation of their employment agreements or whether they merely agreed to a future transfer in the early 1990s and then formally transferred their rights to STC in 2001. The district court did not err in ruling that WesternGe-co was the owner of the patents-in-suit and had standing to sue.
II
We next turn to ION’s challenges to the determination of infringement. As stated earlier, the district court granted summary judgment of infringement on claim 18 of the '520 patent under § 271(f)(1). The jury determined that ION infringed the other asserted claims under § 271(f)(1), and the jury separately determined that ION infringed all of the asserted claims (including claim 18) under § 271(f)(2) as well.
Section 271(f)(1) provides:
Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that *1348 would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.
35 U.S.C. § 271(f)(1) (emphasis added). Section 271(f)(2) provides:
Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.
35 U.S.C. § 271(f)(2) (emphasis added).
ION contends that three errors by the district court require reversal. First, ION contends that the district court misconstrued (f)(1)’s “actively induce” intent requirement in granting summary judgment for claim 18 of the '520 patent and in instructing the jury as to (f)(1) infringement for the other asserted claims. The parties dispute the meaning of the following language of (f)(1): “actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.” 35 U.S.C. § 271(f)(1). The district court held that this requirement was satisfied if the alleged infringer “actively induce[d]” the combination abroad, irrespective of whether the infringer had knowledge that there would be infringement if combined domestically. J.A. 52. ION disagrees with that reading, arguing that the language of (f)(1) requires that ION knew the intended combination would be infringing if done domestically.
We need not reach the question whether the district court applied the correct standard under § 271(f)(1). The -verdict was clear that the jury found liability under § 271(f)(2) for all asserted claims. The district court expressly instructed the jury to “determine infringement ... on a claim-by-claim basis” for both § 271(f)(1) and (f)(2) and instructed them to determine infringement as to claim 18 of the '520 patent under § 271(f)(2). Because there was no contention raised before the district court that the (f)(2) instruction as to the standard of intent was erroneous,[5] and, as discussed below, there were no other errors with respect to the (f)(2) instruction, the correctness of the infringement finding with respect to (f)(2) forms an adequate basis for liability.
ION’s second challenge is to the lack of limiting instructions to the jury with respect to (f)(2). ION proposed that the jury be instructed:
I have previously determined that ION ... infringe^] Claim 18 of the '520 Patent by supplying DigiFIN and the Lateral Controller from the United States intending the two components be combined into a system that infringes Claim 18 utilizing the streamer separation mode. You must accept my finding on infringement as it relates to Claim 18 of the '520 Patent under § 271(f)(1). You should not consider this finding in deciding the question of infringement as *1349 to any other claim or when deciding infringement under § 271(f)(2).
J.A. 10913 (emphasis added). The district court did not err in rejecting this proposed instruction. The district court held that, for both (f)(1) and (f)(2), WesternGe-co was required to prove that ION intended that the components be combined abroad (quite apart from other intent requirements). In granting summary judgment on claim 18, the district court resolved this issue in favor of WesternGeco. The jury was entitled to be advised that this issue — applicable to both (f)(1) and (f)(2) — had been resolved against ION. Because ION’s proposed instruction would have precluded that, it was overly broad, and the district court did not err in refusing to give the instruction. See Bettcher Indus., Inc. v. Bunzl USA, Inc., 661 F.3d 629, 638-39 (Fed.Cir.2011); Biodex Corp. v. Loredan Biomedical, Inc., 946 F.2d 850, 862 (Fed.Cir.1991) (“In order to prevail on the jury instruction issue in this case, [the appellant] must demonstrate both that the jury instructions actually given were fatally flawed and that the requested instruction was proper and could have corrected the flaw.”).[6]
Finally, ION complains that WesternGe-co during trial made improper references to the (f)(1) summary judgment order when arguing that the jury should find (f)(2) infringement. ION did not object to the references when they were made, and ION fails to demonstrate that they constituted plain error requiring reversal in the absence of an objection. See Minks v. Polaris Indus., Inc., 546 F.3d 1364, 1379-80 (Fed.Cir.2008) (plain error reversible only where substantial rights are affected).
III
Although ION does not challenge the reasonable royalty award, ION challenges the award of lost profits resulting from lost contracts for services to be performed abroad. We hold that lost profits cannot be awarded for damages resulting from these lost contracts.
WesternGeco makes the Q-Marine domestically and performs the surveys abroad on behalf of its customers — oil companies looking to extract oil from the sea floor. ION makes the DigiFINs domestically and then ships them overseas to its customers, who, in competition with WesternGeco, perform surveys abroad on behalf of oil companies. WesternGeco identified ten surveys for which it believes that, but for ION’s supplying of DigiFINs to ION’s customers, WesternGeco would have been awarded the contract. These ten surveys allegedly would have generated over $90,000,000 in profit. According to WesternGeco, ION’s customers would not have been able to win the contracts if they did not have access to the DigiFINs. Thus, according to WesternGeco, but for ION’s sales to its customers, WesternGeco would have earned over $90 million in profit from the ten lucrative services contracts performed abroad.
ION argues that WesternGeco cannot receive lost profits resulting from the failure to win these contracts. The service contracts were all to be performed on the high seas, outside the jurisdictional reach of U.S. patent law. There is also no contention that the service contracts were entered into in the United States.
The presumption against extraterritoriality is well-established and undisput *1350 ed. As the Supreme Court ruled in Microsoft Corp. v. AT & T Corp., 550 U.S. 437, 127 S.Ct. 1746, 167 L.Ed.2d 737 (2007), “[t]he presumption that United States law governs domestically but does not rule the world applies with particular force in patent law. The traditional understanding that our patent law operates only domestically and does not extend to foreign activities is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States.” Id. at 454-55, 127 S.Ct. 1746 (citation, alterations, and internal quotation marks omitted). See also Deepsouth Packing Co. v. Laitram Corp., 406 U.S. 518, 531, 92 S.Ct. 1700, 32 L.Ed.2d 273 (1972) (“Oúr patent system makes no claim to extraterritorial effect; ‘these acts of Congress do not, and were not intended to, operate beyond the limits of the United States.’ ” (quoting Brown v. Duchesne, 60 U.S. 183, 195, 19 How. 183, 15 L.Ed. 595 (1856))); Equal Emp’t Opportunity Comm’n v. Arabian Am. Oil Co., 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991) (“It is a longstanding principle of American law ‘that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States.’ ” (quoting Foley Bros. v. Filardo, 336 U.S. 281, 285, 69 S.Ct. 575, 93 L.Ed. 680 (1949))).
Here, the enactment of § 271(f) expanded the territorial scope of the patent laws to treat the export of components of patented systems abroad (with the requisite intent) just like the export of the finished systems abroad. The genesis of Congressional action lay in the Supreme Court’s decision in Deepsouth. In Deepsouth, the Supreme Court determined that a domestic manufacturer who manufactured components of an infringing product and then exported those components abroad without first combining them was not an infringer under § 271(a). 406 U.S. at 527-29, 92 S.Ct. 1700. In response, Congress enacted § 271(f), which overruled Deepsouth to impose liability on domestic entities shipping components abroad (with the requisite intent), just as if they had manufactured the infringing product itself in the United States. See Microsoft, 550 U.S. at 442-45, 127 S.Ct. 1746 (explaining that Congress enacted § 271(f) to hold manufacturers of exported components liable as infringers). There is no indication that in doing so, Congress intended to extend the United States patent law to cover uses abroad of the articles created from the exported components.
It is clear that under § 271(a) the export of a finished product cannot create liability for extraterritorial use of that product. The leading case on lost profits for foreign conduct is Power Integrations, Inc. v. Fairchild Semiconductor Int’l, Inc., 711 F.3d 1348 (Fed.Cir.2013). There, the patentee, a chip supplier, lost contracts to supply a prospective customer with computer chips in the United States and abroad because the accused infringer became a competitor for such contracts as a result of the U.S. infringing sales. If the accused infringer had been precluded from U.S. infringement, the patentee alleged that the accused infringer could not have competed for the contracts which necessarily involved supplying chips both in the United States and abroad. The patentee argued that it should recover world-wide lost profits.
We rejected that argument: “[Our patent laws] do not thereby provide compensation for a defendant’s foreign exploitation of a patented invention, which is not infringement at all.” Power Integrations, 711 F.3d at 1371. Rather, “we find neither compelling facts nor a reasonable justification for finding that [the patentee] is entitled to ‘full compensation’ in the form of damages based on loss of sales in foreign *1351 markets which it claims were a foreseeable result of infringing conduct in the United States.” Id. at 1372. “[T]he entirely extraterritorial production, use, or sale of an invention patented in the United States is an independent, intervening act that, under almost all circumstances, cuts off the chain of causation initiated by an act of domestic infringement.” Id. at 1371-72.
Under Power Integrations, West-ernGeco cannot recover lost profits resulting from its failure to win foreign service contracts, the failure of which allegedly resulted from ION’s supplying infringing products to WesternGeco’s competitors. See also Duchesne, 60 U.S. at 195-96 (“And the use of [the patented technology] outside of the jurisdiction of the United States is not an infringement of [the paten-tee’s] rights, and [the patentee] has no claim to any compensation for the profit or advantage the party may derive from it.”); Halo Elecs., Inc. v. Pulse Elecs., Inc., 769 F.3d 1371, 1380 (Fed.Cir.2014) (“Following Halo’s logic, a foreign sale of goods covered by a U.S. patent that harms the business interest of a U.S. patent holder would incur infringement liability under § 271(a). Such an extension of the geographical scope of § 271(a) in effect would confer a worldwide exclusive right to a U.S. patent holder, which is contrary to the statute and case law.”).
WesternGeco argues that Power Integrations applies to infringement under § 271(a)-(b), not infringement under § 271(f). WesternGeco’s argument misunderstands the role of § 271(f) in our patent law. Section 271(f) does not eliminate the presumption against extraterritoriality. Instead, it creates a limited exception. Microsoft, 550 U.S. at 442, 455-56, 127 S.Ct. 1746. As we have discussed, by its terms, § 271(f) operates to attach liability to domestic entities who export components they know and intend to be combined in a would-be infringing manner abroad. But the liability attaches in the United States. It is the act of exporting the components from the United States which creates the liability. A construction that would allow recovery of foreign profits would make § 271(f), relating to components, broader than § 271(a), which covers finished products. In fact, § 271(f) was designed to put domestic entities who export components to be assembled into a final product in a similar position to domestic manufacturers who sell the final product domestically or export the final product. Just as the United States seller or exporter of a final product cannot be liable for use abroad, so too the United States exporter of the component parts cannot be hable for use of the infringing article abroad.
Of course, the fact that WesternGeco is not entitled under United States patent law to lost profits from the foreign uses of its patented invention does not mean that it is entitled to no compensation. Paten-tees are still entitled to a reasonable royalty, and WesternGeco received such a royalty here.[7]
The dissent raises three principal arguments in favor of allowing WesternGeco to recover lost profits resulting from failing to win the contracts to perform the seismic surveys on the high seas.
First, the dissent identifies Supreme Court cases it believes approved awards of lost profits for foreign sales, citing Goulds’ Manufacturing Co. v. Cowing, 105 U.S. 253, 26 L.Ed. 987 (1881), Dowagiac Manu *1352 facturing, Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 59 L.Ed. 398 (1915), and Duchesne, 60 U.S. 183. None of these cases is remotely similar to this one. To be sure, they suggest that profits for foreign sales of the patented items themselves are recoverable when the items in question were manufactured in the United States and sold to foreign buyers by the U.S. manufacturer. See Goulds’ Mfg., 105 U.S. at 254; Dowagiac Mfg., 235 U.S. at 642-43, 35 S.Ct. 221; Duchesne, 60 U.S. at 196. There is no such claim here. Rather, the claim is for lost profits from the use abroad of the items in question. The dissent’s own authority, Dowagiac Manufacturing, makes clear that absent sales to foreign buyers by the U.S. manufacturer, there can be no recovery of lost profits for foreign sales:
Some of the drills, about 261, sold by the defendants, were sold in Canada, no part of the transaction occurring within the United States, and as to them there could be no recovery of either profits or damages. The right conferred by a pat-entee under our law is confined to the United States and its Territories and infringement of this right cannot be predicated of acts wholly done in a foreign country.
235 U.S. at 650, 35 S.Ct. 221.
Second, the dissent argues that the surveys should be recoverable as “convoyed sales” of the domestically manufactured components of the infringing DigiFINs. But, WesternGeco did not raise this argument before the district court or this court. And, the dissent points to no case extending the convoyed sales doctrine to cover sales of related products or services abroad. See, e.g., State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1575 (Fed.Cir.1989) (making no mention of foreign sales or uses); Minco, Inc. v. Combustion Eng’g, Inc., 95 F.3d 1109, 1118 (Fed.Cir.1996) (same). We see no basis for extending § 271(f)(2) to cover lost profits resulting from the use abroad of U.S. manufactured goods or components thereof in light of the “particular force” of the presumption against extraterritoriality in our patent laws. See Microsoft Corp., 550 U.S. at 454-55, 127 S.Ct. 1746. Certainly in drafting 271(f)(2) Congress did not provide for liability in convoyed-sales situations.
Third, the dissent expresses concern that our ruling today might effectively prevent WesternGeco from recovering lost profits at all, as the surveys were conducted on the high seas and were outside of the territorial reach of any patent jurisdiction in the world. This may or may not be the case. Indeed, WesternGeco does not contend that it is barred from recovering in the jurisdiction in which the services contracted was negotiated and signed, nor does it contend that it is barred from recovering in the jurisdiction from which the ship performing the seismic surveys is flagged. In any event, the possible failure of liability provides no basis for ignoring the presumption against extraterritoriality.
IV
Because we reverse the district court’s lost profits decision, we turn next to West-ernGeco’s conditional cross-appeal.
WesternGeco first challenges the district court’s grant of ION’s motion to exclude WesternGeco’s expert from testifying as to a reasonable royalty. Western-Geco’s damages expert, Raymond Sims, submitted an expert report in which he determined that the reasonable royalty rate for ION’s alleged infringement was 10% of the revenue of ION’s customers. In support of this, he explained that ION’s customers had received $3.3 billion in revenue for performing surveys with the Digi-FINs, and that they would not have been able to receive that revenue without the DigiFINs.
*1353 The district court excluded Sims from testifying as to a reasonable royalty. The district court reasoned “that ION, in a hypothetical negotiation with [WesternGe-co], would [not] have ... agreed to a huge, profit-eliminating (and even revenue eliminating) royalty obligation for itself. As a matter of law, no such risk can be taken in a hypothetical negotiation in which' infringement is deemed known. With knowledge of validity and infringement, such a financially catastrophic agreement would have been totally unreasonable.” J.A. 62.
District courts are tasked with the gatekeeping function of determining whether to allow an expert to testify. See Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). “Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.” Id. (footnote omitted). We review the district court’s decision to exclude an expert for an abuse of discretion. Gen. Elec. Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).
WesternGeco argues that the court improperly adopted a rule that a profit-eliminating royalty was per se unreasonable. It is true that there is no legal rule that caps the reasonable royalty by the amount of the infringer’s profit.[8]
We conclude that the district court adopted no such absolute rule and did not abuse its discretion in excluding the expert. The district court expressly based its ruling on two facts — that the royalty was profit eliminating and that it was revenue eliminating. Indeed, the proposed royalty was so high that it would have exceeded ION’s revenue by four times. WesternGeco cites no case, and we are aware of none, in which we have held that a reasonable royalty can exceed, by a factor of four, the market price for the patented invention. As such, we see no error in the district court exercising its discretion to exclude the expert from testifying as to a reasonable royalty.[9]
V
Finally, WesternGeco challenges the district court’s refusal to award enhanced damages for willful infringement.
In In re Seagate, we announced a two-prong test for willfulness:
[T]o establish willful infringement, a pat-entee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent.... The state of mind of the accused infringer is not relevant to this *1354 objective inquiry. If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.
497 F.3d at 1371. In Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc., we explained that the objective inquiry is a legal question, to be answered by the judge and reviewed de novo. 682 F.3d 1003, 1007 (Fed.Cir.2012).
The jury determined that WesternGeco demonstrated, “by clear and convincing evidence[,] that ION actually knew, or it was so obvious that ION should have known, that its actions constituted infringement of a valid patent claim[J” J.A. 77. Western-Geco subsequently sought enhanced damages in light of the jury’s finding. The district court denied WesternGeco’s motion. The court noted that the jury already determined that the subjective prong was satisfied, but that it was the responsibility of the court to determine if the objective prong had been satisfied. After carefully reviewing ION’s nonin-fringement and invalidity defenses, the district court concluded that they were “not unreasonable by clear and convincing evidence,” “not objectively baseless,” and “reasonable.” J.A. 26-28.
WesternGeco has not established that the district court erred in concluding that ION’s defenses were reasonable and indeed gives relatively little attention to this issue. Instead, WesternGeco argues that ION was not successful with any of its defenses and that ION did not raise any of those defenses on appeal. But unreasonableness, not a lack of success, determines whether enhanced damages are awarded. See Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc., 620 F.3d 1305, 1319 (Fed.Cir.2010) (“Th[e] ‘objective’ prong of Seagate tends not to be met where an accused infringer relies on a reasonable defense to a charge of infringement.”).
WesternGeco also argues that ION’s customers brought the patents to ION’s attention and voiced their concerns regarding possible infringement, and that ION was so concerned about the possibility of infringement that it hesitated to enter into indemnity agreements with its customers. These arguments bear on the subjective inquiry, not the objective inquiry — whether WesternGeco had objectively reasonable defenses. Whether our review is de novo or deferential, we see no error in the district court’s determination.
Conolusion
We affirm in all respects, except that we reverse the district court’s refusal to grant JMOL eliminating the lost profits component of the jury award.
AFFIRMED-IN-PART, REVERSED-IN-PART, AND REMANDED
Costs
Costs to neither party.

. "Geco Prakla” was defined to mean:
SHL; STC and specifically its Geco Prakla engineering, manufacturing and operating divisions and research centers; SCL and specifically its Geco Prakla seismic operating division; SPS; and any other seismic service and/or data processing oil field corporation, firm, partnership or other entity ("entities”) which may, directly or indirectly, be wholly or majority owned by Schlum-berger Limited (SL); and successors of such entities so long as each remains a wholly or majority-owned subsidiary of SL or a successor of SL.
J.A. 12820.

. The agreement defined "Transferred IP” to refer to, inter alia, "Schlumberger Transferred IP,” which is in turn defined to mean *1346 "Intellectual Property that (i) is owned by Schlumberger or its Affiliates or to which Schlumberger or its Affiliates otherwise have rights, (ii) is used or held for use primarily in connection with or otherwise primarily related to the Schlumberger Seismic Business, and (iii) exists as of the Closing Date, including the Schlumberger Proprietary Rights that are identified by Schedule 4.18(a) to the Schlumberger Disclosure Letter." J.A. 12711; 12713. The contract defined "Intellectual Property” to mean:
patents, patent applications (filed, unfiled or being prepared), records of invention, invention disclosures, trademarks (registered or unregistered), trademark applications (filed, unfiled or being prepared), trade names, copyrights (registered or unregistered), copyright applications (filed, un-filed or being prepared), service marks (registered or unregistered), service mark applications (filed, unfiled or being prepared), database rights (registered or unregistered), all together with the goodwill associated with such marks or names, trade secrets, shop and royalty rights, technology, inventions, know-how, processes and confidential and proprietary information, including any being developed (including but not limited to designs, manufacturing data, design data, test data, operational data, and formulae), whether or not recorded in tangible form through drawings, software, reports, manuals or other tangible expressions, whether or not subject to statutory registration, whether foreign or domestic, and all rights to any of the foregoing.
J.A. 12706 (emphases added).

. The three patents at issue here are all continuations of U.S. Patent No. 6,932,017, which was itself based on the PCT application expressly transferred in the 2000 merger. The '017 patent application was initiated under 35 U.S.C. § 371, which provides for the national filing of PCT applications. The three patents at issue could not have been listed in the 2000 agreement because they had not yet been filed.

. Indeed, 35 U.S.C. §§ 118 and 261 contemplate assignment of a right to receive a patent. Section 261 provides in part: "Applications for patent, patents, or any interest therein, shall be assignable in law by an instrument in writing.” Similarly, § 118 provides in part: "A person to whom the inventor has assigned or is under an obligation to assign the invention may make an application for patent.”

. On appeal, ION argues that the (f)(2) jury instruction was incorrect in light of Commil USA, LLC v. Cisco Sys., Inc., 720 F.3d 1361 (Fed.Cir.2013), which was decided six days after the district court’s JMOL order. This argument is mooted by the Supreme Court’s recent decision in Commil USA, LLC v. Cisco Systems, Inc., - U.S. --, 135 S.Ct. 1920, 191 L.Ed.2d 883 (2015).

. ION's denied motions in limine were equally overbroad. For example, ION requested that WesternGeco be precluded from making "[a]ny mention of or reference to this Court’s Orders denying or granting motions for summary judgment.” J.A. 10653; see also J.A. 10793 (refusing to give the instruction).

. The extent to which these royalties may be affected by lost profits suffered abroad is an issue not presented here. See Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 425 F.3d 1366, 1378 (Fed.Cir.2005), overruled on other grounds, Cardiac Pacemakers, Inc. v. St. Jude Med., Inc., 576 F.3d 1348, 1365 (Fed.Cir.2009) (en banc); see also Warsaw Orthopedic, Inc. v. NuVasive, Inc., 778 F.3d 1365, 1378 n. 7 (Fed.Cir.2015).

. See, e.g., Aqua Shield v. Inter Pool Cover Team, 774 F.3d 766, 770-71 (Fed.Cir.2014); Mars, Inc. v. Coin Acceptors, Inc., 527 F.3d 1359, 1374 (Fed.Cir.2008), modified on other grounds, 557 F.3d 1377 (Fed.Cir.2009); Monsanto Co. v. Ralph, 382 F.3d 1374, 1384 (Fed.Cir.2004); State Indus., Inc. v. Mor-Flo Indus., Inc., 883 F.2d 1573, 1580 (Fed.Cir.1989).

. Although not expressly articulated by the district court, it is also worth noting that there were other reasons to exclude the expert’s testimony. -For example, after determining that the patented technology was worth 10% of total revenue, the expert used the revenue generated by ION’s customers resulting from performing the oceanic surveys as the base for that 10% number, rather than the revenue generated by ION resulting from selling the infringing products. This increased, by more than tenfold, the estimated reasonable royalty. Again, we are aware of no case in which the plaintiff has used the defendant’s customer's revenue as the revenue base for calculating a reasonable royalty, and WesternGeco does not identify one.